# IN THE COURT OF APPEALS OF IOWA

No. 20-0069
Filed December 16, 2020

**THOMAS J. BUNTING and LORI A. BUNTING,**
    Plaintiffs-Appellants,

**vs.**

**MARK W. KOEHN,**
    Defendant-Appellee.

_____

Appeal from the Iowa District Court for Clayton County, Richard D. Stochl, Judge.

Thomas and Lori Bunting appeal the district court's ruling on their application to enforce a written easement. **AFFIRMED AS MODIFIED.**

John C. Compton of John C. Compton, P.C., Strawberry Point, for appellants.

Daniel M. Key of The Key Law Firm, LLC, Prairie du Chien, Wisconsin, for appellee.

Considered by Bower, C.J., and May and Ahlers, JJ.

**BOWER, Chief Judge.**

Thomas and Lori Bunting appeal the district court's ruling on their application to enforce the terms of a written easement. With one slight modification, we affirm the court's equitable decree.

**I. Background Facts.**

In 2006, Thomas and Lori Bunting purchased about 400 acres outside of Elkader, Iowa, from the University of Iowa Foundation. They transferred all but 190 acres to others. The Buntings also obtained title to a thirty-two foot lane through a neighboring property. The lane allows access to the Bunting property from Grandview Road to the south and ends at Mark Koehn's property approximately three-quarters of a mile to the north.

Koehn owns an acreage abutting Bunting's property. Koehn purchased his property on contract in 1982 from the party who owned the Bunting property prior to the University of Iowa Foundation. As part of Koehn's purchase agreement, he was granted a permanent easement for "the present roadway fourteen (14) feet in width to allow access to the premises." The roadway lies within the thirty-two foot lane now owned by Bunting. Additional terms of Koehn's easement agreement include:

> [Koehn] shall have the right to use dirt and fill obtained within twenty (20) feet from either side of the centerline of the roadway to maintain and repair the lane. [Koehn] shall have the responsibility for maintaining the lane. In the event the lane is damaged by the Seller, said damage shall be repaired at Seller's expense. The Seller shall have the right to use the lane for access to farm fields adjacent to the property. The Seller shall also have the right to farm the land up to the shoulder of the fourteen (14) foot right of way granted herein.
> [Koehn] shall have the responsibility to maintain all fences bordering Seller's property. In the event the Seller or successors put

cattle on the premises, then the Seller or his successors will pay for one-half of any new fences required.

. . . .

There is a shed on the boundary line between [Koehn's] and Seller's property. [Koehn] shall have the right to use the shed for his lifetime. If the shed is ever destroyed, a new structure may be built only on [Koehn's] property. If the present access road is blocked in the winter, [Koehn] shall have the right to cross Seller's field to provide access to the property. [Koehn] shall also have the right to erect snow fences on Seller's property to minimize drifting on the land. The lane currently contains a creek crossing. Any repairs to said crossing shall be shared 50/50 by [Koehn] and Seller.

All of the provisions of this contract including the easement shall be binding upon the parties hereto and their heirs, successors and assigns.

In the spring of 2015, Bunting was dissatisfied with the maintenance on the lane and hired Curt Bockenstedt, who farms and owns an excavation firm, to blade the road. Bockenstedt "brought in [a dozer] and proceeded to go down through [about 1000 feet of lane down the hill] and put a crown back on the road." Koehn asked Bockenstedt if he was going to take care of the rest of the lane, and Bockenstedt responded he was only hired to do the hill.

Bunting also asked Bockenstedt to look at the culvert in the creek crossing. Bockenstedt noted there was a drain pipe running through the culvert that was partially filled in with timbers.[1] He did not "know why [the timbers] are in there" and suggested Bunting remove them. Over the next couple of years, Bunting did remove the timbers and Koehn replaced them.

In 2016, Jason Sullivan rented and farmed Bunting's acres. On one or two occasions, Sullivan found horses belonging to Koehn in the fields he was working.

---

[1] The parties referred to these obstructions as bridge timbers or planks—the timbers have been cut to fit horizontally inside the lower portion of the opening of the drainage pipe.

After learning of the horses' presence, Bunting contacted fence viewers in October 2016, who determined "an accurate property line needs to be established via survey" and "a partition fence needs to be built to maintain Koehn's livestock"; "[t]he assessed cost to erect the partition fence will be 50/50 assessed equally to each party." Bunting had the survey completed and then contacted a fencing company to erect 1500 feet of fencing. The company would not erect the fence because Koehn was not in agreement. Koehn erected an electric fence along the portions of his property abutting Bunting's land and around the shed at his own expense. The horses did not again go into Bunting's fields.

On December 30, 2016, Bunting filed this suit in equity asserting Koehn (1) failed to maintain the lane, (2) failed to maintain and construct fences bordering Bunting's property, (3) improperly rebuilt the shed in its original site after it had been destroyed, and (4) must help pay for needed repairs to the creek crossing on Bunting's land. Bunting asked the court to order Koehn to comply with the terms of the easement. Bunting also asked for compensatory damages and attorney fees.

Koehn answered and counterclaimed for damages to the lane caused by Bockenstedt's blading of a portion of the roadway, which Koehn asserted was done improperly. He also asserted Bunting had damaged the creek crossing and had failed to share in the repair and maintenance of the crossing.

Trial was held October 24, 2019. After hearing testimony from Bunting, Bockenstedt, Sullivan, and Koehn, the court made these findings:

> The agreement provides that "In the event the lane is damaged by the seller, said damage shall be repaired at seller's expense." Bunting leases the farm to Jason Sullivan. He uses the lane every

time he accesses the property. He drives heavy equipment on the lane including combines, semis, and tractors. Some damage to the lane can be assumed to have occurred as a result of the use of the machinery.

There was an old shed on the property when Koehn bought the property that infringed onto the parcel now owned by Bunting. Koehn's contract allows him to leave that shed despite the fact it is partially on the Bunting land. The shed is still there but has been repaired. Part of the shed collapsed within the last several years and Koehn made repairs. The building is in poor shape but still standing. Bunting claims when the shed collapsed it was essentially torn down and a new building installed and that the new building now infringes on his property and must be moved. The evidence does not support that claim. Koehn did repair the building, but the old shed was never "destroyed" and no "new structure" has been built. Repairs of that shed do not constitute replacing the shed but simply were repairs. . . .

. . . .

As to fencing, Koehn's contract provides: "The buyer (Koehn) shall have the responsibility to maintain all fences bordering Seller's property. In the event the Seller or successors put Cattle on the premises, then the Seller or his successors will pay for one-half of any new fences required." Bunting is asking that Koehn erect 1500 feet of fence between their properties. There was no fence between the properties when Bunting bought the property in 2006. Koehn is obligated to maintain any existing fence but not required to construct a fence nor does Bunting have any right to dictate what type of fence Koehn must erect to contain his horses. Koehn does have an electric fence that has served its purpose.

The lane crosses a small creek that has a culvert. There are timbers placed in the culvert that restrict the flow of water through the culvert that were placed by Koehn. The 1982 contract provides that any repairs to the crossing shall be shared "50/50" by each party. Koehn installed the culvert and believes the crossing is best maintained by his own labor and the placement of timbers. Koehn has not articulated a sound reason for the placement of the timbers and they shall be removed.

Based on its findings, the court ordered Koehn to effect repairs to the lane

"outlined by Bockenstedt"[2] with Koehn paying 75% of the costs and Bunting paying

---

[2] The court's ruling states Bockenstedt "believes some type of grading maintenance should be performed on a lane like this three times per year" and "some gravel should be put down."

25%. The court also ordered repairs to the creek crossing be shared equally by the parties. The court rejected Bunting's requests that Koehn remove the shed, construct fencing, and reimburse Bunting for survey costs, fence viewer fees, 2015 bulldozer work, and attorney fees. Bunting appeals.

## II. Scope and Standard of Review.

We review proceedings tried in equity de novo. Iowa R. App. P. 6.907. We give weight to the court's fact findings, particularly with respect to the credibility of witnesses, though we are not bound by them. Iowa R. App. P. 6.904(3)(g).

## III. Discussion.

*A. Shed.* Koehn's easement provides, "If the shed is ever destroyed, a new structure may be built only on [Koehn's] property." Relying on this term, Bunting takes issue with the court's finding that the shed was repaired rather than "destroyed" and improperly rebuilt still encroaching on his property.

The definition of "destroy" is "to reduce (an object) to useless fragments, a useless form, or remains, as by rending, burning, or dissolving; injure beyond repair or renewal; demolish; ruin; annihilate." *Destroy*, Dictionary.com, https://www.dictionary.com/browse/destroy (last visited Oct. 20, 2020). Bunting offered photos of the shed taken in 2008 or 2009 when the roof partially collapsed after a snow storm and then in 2015 showing what he described as a "pile of junk." Koehn disagreed the shed was destroyed. The shed remains where it has been since 1946. Koehn's insurance company provided him with $7500 to repair the shed. Koehn testified it took him several years to repair the large shed after the roof damage and he reused salvaged materials and spent around $8000 to complete the project.

We conclude the trial court could reasonably find from the evidence presented that the shed was not "reduce[d] . . . to useless fragments" or "injure[d] beyond repair."

*B. Fence.* Bunting asserts he is entitled to a "lawful boundary fence" and the court erred in not requiring Koehn to construct a boundary fence.[3] But Bunting's claims at trial were that Koehn was in violation of his duties under the terms of the easement. With respect to fencing, the easement provides Koehn was required "to maintain all fences bordering [Bunting's] property." To "maintain" means "to keep in existence or continuance; preserve; retain." *Maintain*, Dictionary.com, https://www.dictionary.com/browse/maintain (last visited Oct. 20, 2020). There were no fences on the property when Bunting purchased it. The trial court was correct in finding Koehn had no duty to *construct* a fence under the terms of the easement.[4]

*C. Allocation of costs of road work.* Bunting contends "[t]here is no logical basis" for the trial court's apportionment of costs to repair the lane. Bunting maintains Koehn should bear all expenses for effecting the repair of the lane,

---

[3] Bunting's brief asserts, "Plaintiffs have the right to a lawful boundary fence, as defined in Section 359A.18 of the Code of Iowa (2019)." Section 359A.18 describes a "lawful fence." Chapter 359A governs partition fencing disputes between adjoining property owners, and section 359A.2A grants to fence viewers the "authority to hear and decide all questions related to matters that are part of the controversy." At trial, Bunting specifically stated he was *not* asking the court to enforce the fence viewers' findings. Bunting specifically waived enforcement of the fence viewers' findings and we will not address any claim under chapter 359A here.

[4] Koehn did construct an electric fence in 2016 or 2017 to contain his horses. He did so at his own expense and will maintain it. Koehn testified the electric fence was on Bunting's property around the shed. But he also testified he would move the fence to the property line. We take him at his word.

noting Koehn's refusal to do any maintenance after Bockenstedt's 2015 work on the lane. Koehn asserts the damage to the lane is caused by Bunting's tenant, and under the terms of the easement Bunting should be responsible. He asserts, "The only surprising thing about the trial court's ruling is that the Buntings are only responsible for 25% of the cost of repairs."

Koehn testified at trial that he has not maintained the lane because "[w]hen somebody else comes in there to take care of it, I'm done taking care of it."

We agree with Bunting that Koehn's cessation of all maintenance on the lane is not acceptable under the terms of the easement. Yet, Koehn testified he did not drive heavy equipment over the lane and Sullivan—Bunting's tenant—does. Sullivan testified he used the lane to check on crops and "in the fall I need to use that lane to get the corn out because there is a lot of loads, and I don't want to go across the farm ground." When asked what type of machinery he operated on the lane, Sullivan noted grain carts, semis, field cultivator, combine, and fertilizer trucks. He estimated a semi weighs 80,000 to 90,000 pounds. Sullivan described the condition of the lane in 2019 was very rutted and "impassible just about."

As already set out above, the easement states Bunting is to pay for any damage to the lane caused by his tenant. We find no failure of equity in the court's allocation of the costs.

*D. Creek crossing.* Bunting notes an apparent inconsistency in the trial court's ruling. In its findings of fact, the court stated Koehn had not articulated a sound reason for placement of the timbers in the culvert and "they shall be

removed." It the decretal language, the court wrote, "The bridge planks on the crossing shall be replaced."

As observed in Koehn's brief, neither party is an engineer and neither presented any evidence from an engineer.

Bunting argues he presented evidence the planks in the culvert resulted in backflow and flooding on Buntings' ground. He testified:

> Well, this is about a—I don't know, probably about a [twelve]-foot culvert, maybe nine, nine to [twelve] foot culvert, and there is bridge plank put in the end of it. It restricts the water flow. This creek flows a substantial amount of water when it floods, so the actual water will come around the road and come down on my field because it can't get through this crossing because of the bridge plank, and I would like to see that water go through this instead of out in my field.
> I have dealt with him on this several times, talked to him, and, you know, it ends up with an argument. I can't deal with Mr. Koehn. I just want some of the bridge plank removed so the water can flow through there.
> Q. The placement of the timbers in this culvert divert the natural flow of that creek? A. It backs it up, and like I said, when it floods, it will come around because it's mound up. It will come around and run down through my field.

Bunting testified further:

> Q. And would that take care of the problem, as far as you're concerned, if he just didn't obstruct it? A. It would—it would take care of it on a normal flood, you know. Obviously you get your extreme floods, and the water is going to go where water goes, but—
> Q. Okay. A. But it would certainly help.
> Q. You are asking the court to require him to do what? A. I would like to take out at least half of those [planks], you know.

Bockenstedt testified he did not know why the planks were there.

Sullivan testified Koehn had approached him and told him not to spray or mow along the creek crossing. Sullivan stated:

> I mean, I was down there mowing, and then he told me that I pulled some trees out so I could get my machinery across the creek crossing, and he thought that I knocked some rock down, and he

didn't want me to do that anymore, and he really didn't want me to mow along that lane and stuff like that.

. . . .

Q. Sure. And were any of these trees or areas that you mowed around the creek crossing? A. Yeah.

Q. Okay. And what did you do specifically around the creek crossing? A. Oh, I had a rock bucket, and I go up, and I pulled the trees out, and I took them around the other side and put them by where there are some more piles of trees.

Q. All right. And do you know what vetch grass is? A. I don't, but he showed me. I had no idea what it was before that.

Q. What did he show you? A. He showed me that it was—he said he had some crown vetch.

Q. right. A. That he didn't want me spraying and mowing. I had no idea it was there before I did it. And so—

Q. And did he mention what the purpose of the crown vetch grass was? A. Yes. He said it was to keep the ground from eroding.

Koehn explained the culvert was placed so the drain was actually below the water flow line. Following his uncle's advice, Koehn put six inches of lime in the drain pipe, topped with powdered cement, and then placed the twelve- by four-inch timbers at the end to "silt the pipe in so it will not wash out." Koehn stated the culvert worked until Sullivan mowed the crown vetch planted to control erosion and Bunting removed the planks.

The easement states the Bunting and Koehn are to share the costs of repair to the crossing equally. To date, all costs have been borne by Koehn. In light of the apparently contradictory language of the court's ruling and accepting Bunting's testimony about the relief he seeks, we modify the trial court's decretal language of paragraph four: One-half of the bridge planks on the crossing shall be removed. The costs shall be shared equally by the parties.

And, as required by easement, any costs for future repairs to the creek crossing will be shared equally by the parties.

*E. Additional requests.* Bunting argues the trial court should have apportioned the costs for surveying, bulldozing, fence viewers' fees, and attorney's fees to Koehn as part of an equitable remedy. Like the district court, we are not persuaded Bunting has established a basis for any of these costs to be assessed to Koehn.

Bunting also argues Koehn should be enjoined from further interference with the natural flow of the creek. "Injunctive relief is an extraordinary remedy that is granted with caution and only when required to avoid irreparable damage." *Skow v. Goforth*, 618 N.W.2d 275, 277–78 (Iowa 2000). Bunting argues a need for an avenue for further enforcement when and if future issues arise between the landowners. We are not convinced. Bunting has not established the possibility of irreparable injury.

Costs on appeal shall be assessed one-half to each party.

**AFFIRMED AS MODIFIED.**